**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 09-1087

JEAN MASSIE; SHIRLEY SOWELL;
ALINE REID; YUGONDA ALICE;
THIRD EAST HILLS PARK, INC.;
LOUISE BRANDON

v.

UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT;
ALPHONSO JACKSON, Secretary

Jean Massie,
Appellant

On Appeal from the District Court for the
Western District of Pennsylvania
(Civ. A. No. 06-cv-01004)
District Judge: Donetta W. Ambrose

Argued May 18, 2010

Before: FUENTES, HARDIMAN, and NYGAARD, <u>Circuit
Judges</u>.

(Opinion Filed: September 8, 2010)

Donald Driscoll, Esq.
Kevin L. Quisenberry, Esq.          **(ARGUED)**
Community Justice Project
429 Forbes Avenue
1705 Allegheny Building
Pittsburgh, PA 15219
          *Counsel for Appellants*


Robert L. Eberhardt, Esq.          **(ARGUED)**
Megan E. Farrell, Esq.
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
          *Counsel for Appellees*


James R. Grow, Esq.
Housing Preservation Project
National Housing Law Project
614 Grand Avenue
Suite 320
Oakland, CA 94610
          *Amici Curiae - Appellants*

## OPINION OF THE COURT

FUENTES, Circuit Judge:

Plaintiffs are a class of former residents of Third East Hills Park ("Third East Hills Park" or "the property"), an apartment development in Pittsburgh, Pennsylvania, who formed a co-op known as Third East Hills Park, Inc. (the "Co-op").[1] The Co-op entered into a project-based Section 8 Housing Assistance Payments ("HAP") contract with the United States Department of Housing and Urban Development ("HUD").[2]

---

[1] The District Court certified a class consisting of "residents with fully-paid memberships (in the Co-op) as of the notice of foreclosure on November 10, 2004." (District Court Docket No. 82.) The parties agreed to a list identifying fifty-two putative class members, which was submitted to the Court.

[2] The federal Section 8 rental assistance program provides "rent subsidies for low- and moderate-income participants so that they can afford to leave privately owned housing units." *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 544 n.4 (3d Cir. 2006) (citation omitted). It was established under the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Project-based Section 8 assistance, such as that at issue in this case, is linked to a particular unit. *Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 162 n.2 (3d Cir. 2002). In contrast, tenant-based assistance provides a

3

Pursuant to the HAP contract, HUD would pay a portion of the monthly rent on behalf of eligible low-income tenants. Plaintiffs filed this class action lawsuit seeking to compel action that they claim was unlawfully withheld by HUD. First, they seek an order compelling HUD to maintain the HAP contract at the property following foreclosure (and purchase and rehabilitation by a new owner). They argue that this course of action is required by Pub. L. No 109-115, § 311, 119 Stat. 2396 (2005) ("Section 311").[3] Second, Plaintiffs seek an order compelling HUD to provide class members with relocation assistance at Uniform Relocation Act ("URA") levels, pursuant to 24 C.F.R. § 290.17(d), rather than the lesser amount that HUD provided under 24 C.F.R. § 290.17(c).

Our analysis begins with a threshold issue of the scope of this appeal. We find that the appeal of all class members is properly before us. Turning to the substantive issues, we hold that Section 311 did apply to HUD's management and disposition of the property at issue in this case. HUD failed to make a determination that the property was not feasible for

---

participant with a voucher which may be used at any eligible unit. *Id.*

[3] Section 311, which we discuss at length in Part III.B of this opinion, requires HUD, during fiscal year 2006, to take certain actions in the course of "managing and disposing of any multifamily property" that it owns or holds and that has "rental assistance payments under Section 8 . . . attached to any dwelling units in the property." Pub. L. No 109-115, § 311, 119 Stat. 2396.

continued assistance and therefore failed to comply with the terms of Section 311. Accordingly, we reverse the District Court's grant of summary judgment and hold that HUD must reinstate the HAP contract at the property. We also conclude that the grant of summary judgment on the issue of relocation assistance was improper and remand for additional fact-finding on the issues of whether the tenants were displaced due to a federally financed project and, if so, whether the tenants who were entitled to relocation assistance at URA levels received such assistance.

## I.

### A. HUD Inspections and Foreclosure Recommendation

Each resident of Third East Hills Park had an opportunity to become a shareholder in the Co-op by paying a membership fee. When the Co-op was established in 1974, the fee was $350; this amount has varied over the years. In 1976, the Co-op entered into a Section 8 HAP contract with HUD. The contract was renewed in 2001 for a twenty-year term. Under the HAP contract, HUD pays a portion of each eligible tenant's monthly rent, so long as the Co-op meets certain contractual obligations. Among these, the HAP contract requires the Co-op to lease units on the property to eligible low-income families and to maintain and operate the housing units and related facilities to provide "decent, safe, and sanitary housing." (App. at 707.)

The contract also provides that, if HUD determines that the Co-op has failed to comply with the contract,

> [HUD] shall notify the [Co-op] of (1) the nature of the non-compliance, (2) the actions required to

5

be taken and the remedies to be applied on account of the non-compliance (including actions by the Owner to cure the non-compliance and, where appropriate, abatement of housing assistance payments in whole or in part and recovery of overpayments), and (3) the time within which the [Co-op] shall respond with a showing that it has taken all the actions required of [it]. If the [Co-op] fails to respond or take action to the satisfaction of [HUD], [HUD] shall have the right to terminate the Contract in whole or in part or take other corrective action to achieve compliance.

(*Id.* at 723.)

HUD inspected the property, to ensure compliance, through its Real Estate Assessment Center ("REAC"). Annual inspections, with the purpose of ensuring that units were in a decent, safe, and sanitary condition, were performed in accordance with HUD regulations. The regulations provide for use of a 100-point scale. They also allow for inspection of "a statistically valid sample of the units in [a Public Housing Authority's] public housing portfolio." 24 C.F.R. § 902.20(b)(1). Although the property at issue here was not owned by a public housing authority, this same sampling process was applied.

REAC inspected Third East Hills Park on October 9, 2002; December 5, 2003; and September 22, 2004. The October 2002 inspection resulted in a score of 53. A May 2003 letter identified the deficiencies and gave the Co-op sixty days to

correct them.  The December 2003 inspection resulted in a score of 55.  A June 2004 follow-up by HUD's Departmental Enforcement Center noted numerous deficiencies, many of which had been found in prior inspections.  HUD issued a written notice on July 12, 2004, giving the Co-op thirty days to correct deficiencies and certify compliance and stating that failure to do so would cause HUD to pursue any and all remedies, including abatement or suspension of the HAP contract and possibly foreclosure.  The September 2004 reinspection resulted in a score of 43 points.  Plaintiffs contended before the District Court that all exigent deficiencies were corrected within three business days of the inspection and that they disputed many of the non-exigent deficiencies.

HUD sent a "notice of abatement" to the Co-op President on November 10, 2004, explaining that the Co-op had failed to address the deficiencies outlined in prior letters and was therefore in default on the HAP contract.  (App. at 745.)  The notice stated that HUD would abate payments on all of the units in the property and forbid the Co-op from accepting new Section 8 tenants.  On the same day, HUD sent a separate letter to the Co-op President.  It stated that HUD would initiate foreclosure proceedings on the property's mortgage, which was in technical default due to the failure to correct the physical deficiencies.  HUD would provide an opportunity to show legal reasons why a foreclosure should not occur and allow twenty days for the Co-op to submit its position in writing.  The letter also stated that, at the Co-op's request (within seven days), a meeting would be scheduled – at the Atlanta, Georgia office of HUD – to hear any legal reasons why HUD should not foreclose upon the property.  (*Id*. at 780-81.)

The local HUD office sent a memorandum, also on November 10, 2004, to HUD's Atlanta Multifamily Property Distribution Center, recommending foreclosure on the property. The memo included the prior inspection reports and other documentation. It also included a document entitled "Field Office Foreclosure Recommendation," which described the property. The Recommendation noted that the property adjoined two other affordable housing developments, which had both been sold to developers, who were awarded low-income tax credits and would be improving those properties. According to the Recommendation, Third East Hills Park, in its current condition, would negatively affect the success of the other properties. The area was described in the Recommendation as "heavily impacted with subsidized housing." (*Id.* at 748.) The Recommendation also noted many over-housed units at the property, meaning that the occupants were living in larger units than necessary for their household size. It concluded that the property should be sold to the City of Pittsburgh and the number of units reduced.

In response, the Atlanta office requested additional information regarding the property's fiscal condition. On February 9, 2005, an architecture firm retained by HUD issued a Comprehensive Repair Survey and estimated the total cost of repairs at the property to be $2,497,098. (*Id.* at 822.) HUD determined that the repair costs and operating expenses at the property exceeded the potential property income and "as-is value." Plaintiffs dispute this analysis. As they note, a question at the bottom of HUD's Sales Analysis form – which analyzed repair costs, operating expenses, and potential income – specifically asks whether the project is financially viable after

8

repairs, and the answer given is "yes." (*Id*. at 822.) The form also states that the project would produce an annual "net operating income" of $343,934. (*Id*.)

## B. Displacement of Residents

In November 2004, during the same period that it sent the Co-op a "notice of abatement" and recommended foreclosure on the property, HUD also sent a "notice of displacement" to residents informing them of its intent to relocate them for "health, safety, and security reasons." (*Id*. at 784.) Residents with executed leases would receive moving expenses, and income-eligible tenants would receive a voucher for Section 8 tenant-based rental assistance. The letter also announced a December 2, 2004 meeting to discuss relocation benefits.[4] HUD sent another letter on February 10, 2005 to all residents, advising them of HUD's intent to foreclose on the property "within the next few months." (*Id*. at 813.) It stated that tenants receiving project-based rental assistance would receive Section 8 voucher assistance if such assistance was available and the tenant was eligible. It also provided some of the tentative terms and conditions of the foreclosure sale and gave residents a

---

[4] The organization that HUD contracted with to provide the relocation assistance, Lord and Dominion Investments Management, sent a letter to residents on or about December 8, 2004. The letter informed the residents that the Co-op Board President had requested that Lord and Dominion no longer use a meeting room on the property to provide relocation assistance and that, as a result, it would be moving off the property.

number to call with questions or to offer input regarding the process.

On June 20, 2005, HUD issued a notice to residents, informing them that relocation assistance would end at the close of business on July 31, 2005. Residents were required to have moved out by that date in order to receive assistance. Those who moved out after that date and were certified as eligible for a Section 8 voucher could still receive one, but would not obtain relocation assistance. HUD terminated the HAP contract on March 10, 2006. The majority of residents moved out with relocation assistance, but the parties agree that as of at least October 26, 2006, fourteen residents remained.

### C. Sale and Purchase of the Property

In March 2005, shortly after HUD had informed residents of its intent to foreclose, the Urban Redevelopment Authority of Pittsburgh ("URAP") informed HUD that it might be interested in purchasing the property. (Supp. App. at 27.) It requested that HUD consider maintaining project-based Section 8 assistance for residents who had not moved at the time of foreclosure. In an April 2005 response, HUD said it would consider selling the property to URAP, but that the project-based HAP contract would not be renewed, as such continuation is "contrary to current HUD policy." (*Id.* at 29.)

On June 9, 2006, HUD authorized payment to URAP of a $3,400,000 "up-front grant" contingent on HUD acquiring the property through the foreclosure sale. HUD notified remaining residents on June 22, 2006 that it intended to sell the property to URAP immediately if it acquired it at auction. (App. at 877.) This June 2006 notice included a copy of HUD's disposition

plan, with details regarding the transfer of title. (*Id*. at 878-80.) It asked for written comments within thirty days. The disposition plan provided that URAP would, within twelve months of taking title, relocate any remaining residents, either on or off site, in order to facilitate redevelopment. URAP would also reimburse residents for moving expenses and "endeavor to provide an opportunity to apply for readmission to the redeveloped property to all current and relocated residents who desire to return." (*Id*. at 879.) HUD received no comments on this initial disposition plan within the thirty-day period. It finalized and approved the plan on July 25, 2006. (Supp. App. at 32-35.)

HUD and URAP entered into a contract for sale of the property, conditioned on HUD obtaining title at the foreclosure sale. (App. at 883.) The contract included a rider requiring URAP to relocate remaining residents within twelve months, comply with relevant statutes and regulations, reimburse residents for moving expenses, and provide notice of any expected displacement. (*Id*. at 904-05.) HUD purchased the property at foreclosure on October 6, 2006 and immediately transferred it to URAP through a deed that included this rider.

URAP subsequently entered into a Memorandum of Understanding with Third East Hills Limited Partnership ("TEHLP") and sold the property to TEHLP, which was to demolish existing units and renovate the property. Approximately thirty three-bedroom units were to be created, with special mortgages and subsidies to make them affordable to most former residents of the property. First priority was to be given to those residing on the property on or after October 26, 2006. Second priority would be given to Co-op members living

11

at the property on or after November 10, 2004. Anyone else living at the property on or after November 10, 2004 would receive third priority.

## D. Procedural History

Plaintiffs filed an "emergency complaint" in this matter and sought a Temporary Restraining Order ("TRO") on July 26, 2006. The District Court granted the TRO on July 27, 2006. After receiving written submissions and holding a hearing on the matter, the Court denied a preliminary injunction request on August 9, 2006. On January 19, 2007, the District Court granted Defendants' motion to dismiss, dismissing all but one claim for lack of subject matter jurisdiction and the remaining claim – alleging the violation of Section 311 – for failing to state a claim. The case was closed.

Plaintiffs promptly filed a motion for reconsideration, which the Court granted, reopening the case. The District Court found that its prior opinion was based in part on the Defendants' misstatement of "HUD's position regarding the applicability of § 311 to the disposition of HUD held mortgages." *Massie v. U.S. Dep't of Hous. and Urban Dev.*, No. 06-1004, 2007 WL 674597, at *2 (W.D. Pa. Mar. 1, 2007). HUD's counsel acknowledged that, at the time its prior brief was drafted, counsel "did not know that HUD Office of Multifamily Housing Programs had determined that it would comply with § 311 in its disposition of both multifamily properties that the Secretary owns *and multifamily mortgages that the Secretary holds*." *Id.* The District Court also found, contrary to its prior ruling, that it did have jurisdiction to review a claim that HUD failed to comply with its own regulations as well as the Plaintiffs' due

12

process claims. The Court issued an order clarifying that three claims remained: (1) the alleged violation of Section 311; (2) HUD's alleged violation of Plaintiffs' procedural due process rights, for failing to provide Plaintiffs with an opportunity at the foreclosure hearing to present factual (and not just legal) objections to the foreclosure; and (3) HUD's failure to comply with its own regulations for management and disposition of the HUD-held mortgage at Third East Hill Park.

Thereafter, the Court denied Plaintiffs' request for merits discovery under the Administrative Procedures Act ("APA"). The parties filed cross-motions for summary judgment, and the District Court granted Defendants' summary judgment motion on all claims. We discuss the District Court's reasoning in detail *infra*. The Court then denied Plaintiffs' motion for reconsideration, which it found merely rehashed prior arguments. This appeal, from the denial of reconsideration, followed.[5]

Plaintiffs raise three issues in their brief on appeal. First, they contend that HUD violated Section 311 and accordingly they seek an order compelling HUD to maintain the project-

---

[5] The Plaintiffs entered a Stipulation of Non-Interference on December 4, 2007. In this stipulation they acknowledged that the property had been conveyed to HUD, from HUD to URAP, and then from URAP to TEHLP. Under the terms of the stipulation, no members of the Plaintiff class would seek to reverse the foreclosure sale or seek any equitable relief that could jeopardize the right of TEHLP to redevelop the property.

13

based Section 8 rental assistance at the property. Second, they claim that the District Court erred in finding that HUD was not required to provide a higher level of relocation assistance, in accordance with 24 C.F.R. § 290.17(d). Third, in response to our request for supplemental briefing, they argue that the entire Plaintiff class, and not Jean Massie alone, filed a proper notice of appeal from the District Court's decision. Because this final issue shapes the scope of our review, we will address it first.

## II.

Our review of the District Court's grant of summary judgment is *de novo*. *Nova Chems., Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 323 (3d Cir. 2009). We construe the facts in the light most favorable to the nonmoving party. *TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 199 (3d Cir. 2001). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Plaintiffs bring claims pursuant to the Administrative Procedure Act ("APA"), seeking to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). As one of our sister circuits has held, this provision "does not give us license to 'compel agency action' whenever the agency is withholding or delaying an action we think it should take. Instead, our ability to 'compel agency action' is carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).

In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004), the Supreme Court reviewed the scope of

14

judicial review of agency inaction. It held that review of an agency's "failure to act" is limited to a *discrete* action. *Id.* at 63. The Court reviewed five categories of agency actions, with the category of "relief" including, *inter alia*, a "grant of money [or] assistance," which would encompass the HAP contract at issue in this case. *Id.* at 62. "[T]he only agency action that can be compelled under the APA is action legally *required*," as § 706(1) authorizes courts to compel agency action that is "*unlawfully* withheld." *Id.* at 63. The Supreme Court concluded in *Norton* that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Id.* at 64; *see also Oil, Chem. & Atomic Workers Union v. Occupational Safety & Health Admin.*, 145 F.3d 120, 124 (3d Cir. 1998) (describing our review under § 706(1) to include "inaction that is . . . contrary to a specific Congressional mandate"). Hence, we review HUD's actions in this case to determine if it "failed to take a *discrete* . . . action that it is *required* to take." *Norton*, 542 U.S. at 64.

### III.

### A.

We directed the parties to brief the issue of who is, or are, the proper appellant or appellants in this case. The initial notice of appeal filed in the case listed "Jean Massie" as the named party appealing the District Court's order. The notice also included a caption of "Jean Massie, et. al. v. U.S. Department of Housing and Urban Development, et. al." (App. at 1.) An amended notice of appeal was subsequently filed and separately docketed under a distinct case number; it included as the named parties five plaintiffs, followed by the phrase "on behalf of

15

themselves and all others similarly situated (certified class)."
(*Id.* at 2.) Since this second appeal was untimely, the parties
were directed by the Clerk to address the attempt to add
additional appellants to this case. Plaintiffs stated in response
that, because the only claims were those asserted by the class as
a whole and the class had been certified under Rule 23(b)(2),
they did not realize that each nominal Plaintiff needed to be
listed on the notice. HUD argued that we are without
jurisdiction to add parties to the notice of appeal because
Federal Rule of Appellate Procedure 3, which outlines the
requirements for a notice of appeal, is jurisdictional and,
according to HUD, the original notice failed to satisfy Rule
3(c).[6]

---

[6] Federal Rule of Appellate Procedure 3(c)(1) provides:

(1) The notice of appeal must:

(A) specify the party or parties taking the appeal
by naming each one in the caption or body of the
notice, but an attorney representing more than one
party may describe those parties with such terms
as "all plaintiffs," "the defendants," "the plaintiffs
A, B, et al.," or "all defendants except X";

(B) designate the judgment, order, or part thereof
being appealed; and

(C) name the court to which the appeal is taken.

A separate provision, in Rule 3(c)(3), specifically deals with
class actions. It states:

16

The Supreme Court has held that Rule 3(c) is jurisdictional in nature and that a court may not waive its jurisdictional requirements, even for good cause, if it finds that they have not been satisfied. *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 (1988). We conclude that Massie complied with Rule 3(c) by using the District Court's caption (which included "et. al.") and naming the lead plaintiff in the blank on the Notice of Appeal form. Rule 3(c)(1)(A) permits specifying "the party or parties taking the appeal by naming each one in the caption or body of the notice." The caption on the notice of appeal included "Jean Massie et. al."

We also find that the notice of appeal satisfied Rule 3(c)(3), which states that the notice of appeal in a class action "is sufficient if it names one person qualified to bring the appeal as representative of the class." HUD relies on the Seventh Circuit's decision in *Marrs v. Motorola, Inc.*, 547 F.3d 839, 840 (7th Cir. 2008) (per curiam), which held that Rule 3(c)(3) requires the notice of appeal to specify that the class representative is appealing *in a representative capacity*. The *Marrs* opinion does not provide detail regarding the nature of the notice filed in the case, but states that the notice contained no indication that the appeal was intended to be in a representative capacity and "does not mention other claimants or a class." *Id.* Although the notice specified the judgment being appealed, there is no discussion in *Marrs* of the

---

(3) In a class action, whether or not the class has been certified, the notice of appeal is sufficient if it names one person qualified to bring the appeal as representative of the class.

17

application of Rule 3(c)(1) and whether a caption with "et. al." was included in the notice, as is the case here. Regardless of these potential factual distinctions, we disagree with the Seventh Circuit's interpretation of Rule 3(c)(3) and find that it merely requires that a person who is "qualified to bring the appeal as representative of the class" be named in the notice of appeal and not that the notice expressly state that the individual is in fact appealing in a representative capacity. As noted, we also find that the class was named in the caption of the notice of appeal, satisfying Rule 3(c)(1)(A).

Our decision accords with those of circuit courts that have faced similar situations. In *Olenhouse v. Commodity Credit Corp.*, the Tenth Circuit stated that "[w]hile we discourage use of the phrase 'et al.' to identify any group of appellants, we agree where a class has been certified, the phrase provides sufficient notice of who is taking the appeal to satisfy the requirements of Fed. R. App. P. 3(c)." 42 F.3d 1560, 1572 (10th Cir. 1994). Here, the phrase "et al." had been used in the caption of the Notice of Appeal, and the singular "plaintiff's" appeared in the body. In *Ford v. Elsbury*, 32 F.3d 931, 934 (5th Cir. 1994), the Fifth Circuit found that Rule 3(c), which had just been amended in 1993 with the intent of "liberaliz[ing] the pleading requirements for a notice of appeal," was satisfied. "The style of the notice identified the plaintiffs as 'Undray D. Ford, et al.,' and the body of the notice identified the appealing parties as the ''Ford' plaintiffs.'" *Id.* at 933. The court deemed this sufficient as to all the plaintiffs in the uncertified class action on appeal.

Accordingly, we find that an appeal on behalf of all class members is properly before us.

18

**B.**

Plaintiffs argue that HUD failed to comply with Section 311 when it terminated the HAP contract at Third East Hills Park. They contend that the District Court erred when it deferred to HUD's interpretation of the applicability of Section 311.

Section 311 provides:

Notwithstanding any other provision of law, in fiscal year 2006,[7] in managing and disposing of any multifamily property that is owned or held by the Secretary of Housing and Urban Development, the Secretary shall maintain any rental assistance payments under Section 8 of the United States Housing Act of 1937 that are attached to any dwelling units in the property. To the extent the Secretary determines that such a multifamily property owned or held by the Secretary is not feasible for continued rental assistance payments under such section 8, based on consideration of the costs of maintaining such payments for that property or other factors, the Secretary may, in consultation with the tenants of that property, contract for project-based rental assistance payments with an owner or owners of other existing housing properties, or provide other rental assistance.

---

[7] Fiscal year 2006 ran from October 1, 2005 through September 30, 2006.

19

The text of this provision presents three questions that will structure our analysis: (1) what does it mean for a "rental assistance payment" to be "attached to any dwelling units in the property"; (2) what is the test for whether continued rental assistance is feasible; and (3) what is the nature of the consultation required between HUD and the tenants? This property clearly satisfied the "owned or held" element of Section 311, as HUD held the mortgage, a point that the parties do not dispute.

**1.**

In order for Section 311 to apply to HUD's disposition of the property, the rental assistance payments must have been "attached to . . . dwelling units in the property" during fiscal year 2006. Noting that the statute does not define the term "attached," nor did the parties provide any case law interpreting the term, the District Court drew on a dictionary definition, "to fast or affix; join; connect." (App. at 20.) The Court concluded that, since all rental assistance payments on the units were abated as of November 10, 2004, – no rental assistance payments were attached to any of the units in fiscal year 2006 and hence Section 311 did not apply. Plaintiffs and their amicus argue that instead the crucial date is March 10, 2006, when the HAP contract was terminated. On this argument, the housing assistance payments, which were only suspended during the abatement period, remained attached to the property, for the purposes of Section 311, so long as the HAP contract had not been terminated.

HUD contends that the crucial date is the date of foreclosure, October 26, 2006, which came after the end of

fiscal year 2006, rendering Section 311 inapplicable. HUD claims this date is important as the statute refers to "managing and disposing" of property. The foreclosure, according to HUD, is the act of disposing. Plaintiffs reject this and contend that "managing and disposing" must be read to include activities in furtherance of disposing of the property that began long before the foreclosure sale itself. The act of terminating the HAP contract, they contend, is part of this process of managing and disposing of the property. We agree with Plaintiffs and find the natural reading of "managing and disposing" is that this phrase refers to a process, which would include, among other steps, the termination of the HAP contract. "Managing and disposing" does not, as HUD argues, refer solely to the precise moment of foreclosure. *See* 12 U.S.C. § 1701z-11 (outlining manner in which HUD is to manage and dispose of a multifamily housing project). Moreover, HUD adopted this same interpretation in its own memorandum entitled "Fiscal Year 2006 Property Disposition Program" ("HUD Memorandum"), which was issued by the Deputy Assistant Secretary for Multifamily Housing Programs to "provide instructions . . . regarding property disposition requirements for the [Fiscal Year] 2006." (App. at 83.) The memorandum expressly states that Section 311 applies to properties "for which the Secretary holds the mortgage and is *in the process of disposing* [of] the property at foreclosure." (*Id.* at 86) (emphasis added).[8]

---

[8] The HUD Memorandum provided, in relevant part, that:

[T]he Secretary is required to maintain the project-based Section 8 HAP contract in any multifamily property that the Secretary owns or

21

for which the Secretary holds the mortgage and is in the process of disposing [sic] the property at foreclosure. To the extent that the Secretary determines that it is not feasible to continue such assistance for the property, based on the cost of maintaining such assistance or other factors, the Secretary, in consultation with the residents, may provide project-based Section 8 rental assistance at another existing property (or properties) or provide "other rental assistance." (See below under the Feasibility Analysis Section, if it is recommended that the Section 8 HAP contract should be terminated after the foreclosure sale.) Note: for properties where assistance under the project-based Section 8 HAP contract has been abated and the HAP contract has been or will be terminated upon completion of the relocation of all the residents, the Department will not offer the property with a HAP contract at the foreclosure sale.

(App. at 86.)

We note that HUD's Memorandum is not the type of agency interpretation of a statute to which we afford deference under *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). Therefore, we do not deem it an authoritative interpretation of Section 311. In *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001), the Supreme Court held that "administrative implementation of a particular

22

statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Although administrative agency interpretations entitled to *Chevron* deference are typically products of "notice-and-comment rulemaking or formal adjudication[,]" such procedures are not always required. *Id*. at 230-31. However, the Court has held that "interpretations contained in policy statements, agency manuals, and enforcement guidelines" are not entitled to *Chevron* deference. *Id*. at 234 (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

HUD's Memorandum, from the Deputy Assistant Secretary for Multifamily Housing Programs to the directors of those programs, is most akin to an agency manual and clearly "lack[s] the force of law" and does not "warrant *Chevron*-style deference." *Christensen*, 529 U.S. at 587. While this type of informal interpretation could be eligible for lesser deference under *Skidmore v. Swift & Co.*, depending on "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements," HUD has not argued that the Memorandum is entitled to deference under *Skidmore*. 323 U.S. 134, 140 (1944); *Lawrence v. City of Phila.*, 527 F.3d 299, 316 n.6 (2008).

Moreover, we find that HUD's actions in disposing of the property did not even accord with the interpretation of Section 311 provided by the Memorandum. If anything, as we note,

Having rejected HUD's contention that it did not manage or dispose of the property during the relevant period, we return to the issue of whether housing assistance payments were "attached to any dwelling units in the property" during fiscal year 2006. The District Court concluded that due to the abatement of housing assistance payments, according to which HUD suspended making payments, the payments were no longer "attached to any dwelling units." Plaintiffs emphasize that the HAP contract remained in place at the property until it was terminated in March 2006, within fiscal year 2006. This distinction has practical importance, because so long as the HAP contract was not terminated, payments that had been abated or suspended could be restored if the deficient conditions were remedied, nullifying the reason or reasons for the abatement. According to Plaintiffs, so long as the HAP contract was not terminated, payments remained "attached to . . . dwelling units in the property" for the purposes of Section 311.

On this reading, the phrase "attached to any dwelling units" serves primarily to indicate that Section 311 applies to "project-based" Section 8 rental assistance, like that at issue in this case, rather than "tenant-based" assistance. Hence the issue is not whether units were still receiving payments at the time in question, which the District Court focused on, but whether a valid HAP contract existed at, or was attached to, the property. This interpretation accords with the use of the term "attached" in related portions of Section 8 of the Housing Act. Specifically, the Act provides that "the term 'project-based

portions of the Memorandum provide support for the Plaintiffs' interpretation of Section 311.

24

assistance' means rental assistance under subsection (b) of this section that is *attached to the structure* pursuant to subsection (d)(2) or (o)(13) of this section." 42 U.S.C. § 1437f(f)(6) (emphasis added); *see also Truesdell*, 290 F.3d at 162 n.2 ("Project-based assistance differs from tenant-based assistance in that the former is tied to a particular unit, whereas the latter entails a voucher entitling the participant to select a unit anywhere in [the relevant] jurisdiction."). Section 1437f(o)(13)(A) states that "[a] public housing agency may use amounts provided under an annual contributions contract under this subsection *to enter into a housing assistance payment contract* with respect to an existing, newly constructed, or rehabilitated structure, *that is attached to the structure*, subject to the limitations and requirements of this paragraph." (emphasis added).

Although the text of Section 311 uses the phrase "rental assistance payments" and does not include the word "contract," we find, in light of the nature of project-based Section 8 housing, that the statute should be read to refer to any dwelling units for which a HAP contract remains in effect. Therefore, the important issue is whether there was an existing HAP contract at the property, not whether payments were actually being made on individual units. In addition, we note that HUD endorsed this interpretation in its Memorandum regarding the "Fiscal Year 2006 Property Disposition Program," which interprets Section 311. The HUD Memorandum states that "[i]n accordance with Section 311 . . . the Secretary is required to maintain *the project-based Section 8 HAP contract* in any multifamily property that the Secretary owns or for which the Secretary holds the mortgage and is in the process of disposing [of] the property at

25

foreclosure." (App. at 86.) The HUD Memorandum expressly references the HAP contract and not individual payments. It is perhaps for this reason that HUD, in its brief on appeal, focuses on the foreclosure date and not the District Court's analysis of the phrase "attached to any dwelling units."

We find the District Court's interpretation problematic for another reason. If Section 311 only requires HUD to maintain the rental assistance payment amounts that are actively being made at the time in question, rather than the payments attached to the property through the HAP contract, then much would depend on the determination of a precise moment of "managing and disposing." The HAP contract provides for fluctuations in the payments being made based on vacant units, changes in family income or composition, and other factors. (App. at 709.) It cannot be that Congress intended for HUD to maintain only the precise payments being made at a moment in time, without regard for the contract terms that determine and adjust the amount of housing assistance payments to be made to an owner. Nor do we find it reasonable to conclude that Congress would want the determination of whether an entire HAP contract should be maintained at a property to potentially hinge on whether, at a moment in time or even during a period of "managing and disposing" of the property, a single unit is or is not actively receiving payments. Although such a situation may seem far-fetched, it gives us further reason to reject this reading of the statute, particularly when another interpretation is reasonable, is clearly supported by the use of similar statutory language in related provisions, and, as discussed below, accords with the legislative intent. *See United States v. Turkette*, 452 U.S. 576, 580 (1981) ("[A]bsurd results are to be avoided.").

26

The conclusion that Section 311 does not apply to a property when rental assistance payments have been abated would also effectively render Section 311 inoperative in certain cases in which, by its terms, it is clearly intended to apply. This would violate a core tenet of statutory interpretation, "that no provision 'shall be superfluous, void, or insignificant.'" *In re Phila. Newspapers, LLC*, 599 F.3d 298, 330 (3d Cir. 2010) (citation omitted); *see also Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (discussing "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative") (citation omitted). Whenever HUD is in the process of managing and disposing of a multifamily property it abates housing assistance payments. This process is outlined in HUD's agency handbook entitled "Multifamily Property Disposition – Management (4315.1)." HUD Handbook 4315.1. The Handbook expressly provides that when HUD takes ownership of a multifamily project with a HAP contract, the HAP contract "must not be canceled." *Id.* § 5-21. At the same time, the Handbook's Appendix includes a form for notifying HUD's Regional Accounting Division of HUD's acquisition of a property. *Id.* at Appendix 5-4. This form notifies the Regional Accounting Division that, since HUD has assumed ownership of the subject project, Section 8 payments to the former owner should be abated, but the "Section 8 Contract and Budget authority remaining on this project must not be recaptured." *Id.* Hence, abatement always occurs when HUD assumes ownership during the process of managing and disposing of a multifamily property. To find that this abatement process renders Section 311 inapplicable would cause Section 311 to not apply in situations when the statute's text specifically states that it does

27

apply, when the property "is owned or held" by HUD and HUD is in the process of "managing and disposing" of the property.[9]

The legislative history of Section 311 also supports our reading of the statute. It reveals strong support for project-based Section 8 housing and statements of concern regarding HUD's commitment to maintaining project-based assistance. In the Senate Report, the Senate Appropriations Committee expressed concern:

> that HUD is not committed to maintaining section 8 project-based housing and may be encouraging owners to opt out of the program. This would be

---

[9] We recognize that the HUD Memorandum states, at the conclusion of a section analyzing the application of Section 311, that "for properties where assistance under the project-based Section 8 HAP contract has been abated and the HAP contract has been or will be terminated upon completion of the relocation of all the residents, the Department will not offer the property with a HAP contract at the foreclosure sale." (App. at 86.) Given our analysis, this passage must be read with the understanding that the "HAP contract has been or will be terminated" in accordance with the terms of Section 311. We do not read this passage as allowing for "exceptional cases" where HUD may simply ignore the requirements of Section 311 when it first abates the contract. (*See* Appellee's Br. at 17.) To the extent HUD contends that it has the authority to terminate a HAP contract through this method, without having to comply with the terms of Section 311, we reject that position as clearly in violation of the terms of Section 311.

28

a tremendous mistake since affordable housing needs are growing while the stock of affordable low-income housing is shrinking. HUD is directed to report no later than June 30, 2006 on the status of HUD's efforts to retain section 8 project-based housing, including a 5-year analysis of units lost and retained, by year, State, and locality. HUD is also directed to provide an analysis of all efforts made by HUD to preserve low-income section 8 units. The Committee also directs GAO to assess HUD's efforts and success in preserving HUD-assisted low-income housing, *especially section 8 project-based housing*, including recommendations on how better to preserve this housing.

S. Rep. No. 109-109, at 103, *reprinted in* 2006 U.S.C.C.A.N. 1260 (2006) (emphasis added). The District Court, in its own analysis, relied substantially upon a misreading of the legislative history. The Court analyzed the relevant legislative history and concluded that both houses of Congress intended for HUD to shift from a "unit-based" to a "budget-based" program. The Court interpreted "unit-based" as a reference to "project based" Section 8 assistance and "budget-based" as a reference to "tenant based" Section 8 assistance.

These terms appear in sections of the Congressional Report entitled "Tenant Based Rental Assistance." S. Rep. No. 109-109, at 142; H. Rep. No. 109-153, at 71-74 (2005), 2005 WL 6406124. In this context, the phrases refer to two different ways of funding the tenant-based, or voucher, Section 8 program, either a unit-based method (funding a certain number

of vouchers, equivalent to a certain number of units, and adjusting accordingly each year for changes in rent and other variables), or a budget-based method (which would focus on the total budget). The House Report makes this clear, as it notes that in the prior year "Congress estimated the costs of the Tenant-based program based on units under lease during the three-month period that immediately preceded passage of the Act." H. Rep. No. 109-153, at 72. Similarly, in the Senate Report the Committee "directs HUD to report no later than June 30, 2006 on the effectiveness of this budget-based approach *to vouchers*." S. Rep. No. 109-109, at 144 (emphasis added). Accordingly, we believe that the District Court erred when it interpreted Section 311 as "an attempt to complete the phase-out of a unit-based program," which it deemed "the overall point behind 109 P.L. 115." *Massie*, 2008 WL 4443830, at *10. Instead, the legislative history reveals Congress's concern with "maintaining section 8 project-based housing." S. Rep. No. 109-109, at 103. Clear statements of the intent behind Section 311 reinforce our interpretation of the statutory language and our conclusion that Section 311 applied to HUD's management and disposition of Third East Hills Park.

## 2.

Having concluded that Section 311 did apply to HUD's disposition of the property, we must determine whether HUD complied with the requirements outlined in the second sentence of Section 311.[10] This provision permits HUD to "contract for

---

[10] The relevant portion of Section 311 provides:

project-based rental assistance payments with an owner or owners of other existing housing properties, or provide other rental assistance," provided that it has determined that the property "is not feasible for continued rental assistance payments." Hence, HUD must first make this infeasibility determination before deciding to provide either project-based rental assistance at another location or some other form of rental assistance.[11]  Section 311 further requires that HUD "consult[]

> To the extent the Secretary determines that such a multifamily property owned or held by the Secretary is not feasible for continued rental assistance payments under such section 8, based on consideration of the costs of maintaining such payments for that property or other factors, the Secretary may, in consultation with the tenants of that property, contract for project-based rental assistance payments with an owner or owners of other existing housing properties, or provide other rental assistance.

Pub. L. 109-115, 119 Stat. at 2462.

[11] At argument, HUD contended that the feasibility determination was discretionary, noting the presence of the word "may." We reject this position as completely unsupported by the statutory language. The language makes clear that HUD may provide other forms of rental assistance only "[t]o the extent the Secretary determines that [the property] is not feasible for continued rental assistance payments." Pub. L. No. 109-115, § 311, 119 Stat. at 2462. Absent such a determination, HUD

31

with the tenants" before providing another form of rental assistance. Plaintiffs argue that HUD neither determined that the property was not feasible for continued assistance nor did it properly consult with tenants before deciding to provide voucher assistance for use at other properties. We address each of these contentions in turn.

In support of their contention that HUD did not determine that the property at issue was "not feasible for continued rental assistance payments," Plaintiffs cite HUD's own economic feasibility analysis, including a survey of needed repairs and a "Sales Analysis," which assessed whether the project would be financially viable after the repairs were made. The Sales Analysis, which considered repair costs, annual expenses, and rental income, among other factors, concluded that the property would produce an annual "Net Operating Income" of $343,933. (App. at 821-22.) At the bottom of the analysis, a section entitled "Project viability after repairs" asked whether the project was "Financially viable?" and the answer given was "yes." (*Id.* at 822.)

HUD failed in its briefing and at oral argument to address the import of the determination, in its own Sales Analysis, that

_____

"shall maintain any rental assistance payments." *Id.* Moreover, this interpretation is expressly contradicted by HUD's own memorandum, which states that "[i]n the event the recommendation is not to continue with the project-based Section 8 HAP contract for all units, the Property Disposition Center is *required* to conduct a feasibility analysis." (App. at 88 (emphasis added).)

the project was financially viable. This determination would appear to foreclose a conclusion that continued rental assistance is "not feasible." HUD contends, however, that the repair survey it commissioned "demonstrated that needed repairs would cost almost twice the amount of the current mortgage on the Property." (Appellee's Br. at 40.) It also notes that the Sales Analysis, which it also refers to as a "Peer Analysis," demonstrated "that repair costs and operating expenses for the project far exceeded potential property income and 'as-is' value." (*Id.*) Absent, however, from both HUD's analyses during the period in which it managed and disposed of the property and its briefs on appeal is any explanation of why these assertions indicate that the property is "not feasible for continued rental assistance payments." Repairs may well have cost more than the current mortgage, but this does not indicate that once repairs are made that it is not feasible to continue to provide rental assistance payments. This is particularly true where, as here, the analysis expressly concludes that the property will produce a net operating income.

HUD further contends that Section 311 does not specify the standards for a feasibility determination. Section 311 allows HUD to make a feasibility determination "based on consideration of maintaining such payments for that property or other factors." Pub. L. No. 109-115, § 311, 119 Stat. at 2462. HUD claims, relying on *Chevron*, 467 U.S. at 843, that it possesses discretion regarding the form of the feasibility determination. Accordingly, it argues that it conformed with the standards outlined in its memorandum on the "Fiscal Year 2006 Property Disposition Program," which includes a section entitled "Feasibility Analysis." (App. at 88.) The memorandum states

33

that HUD's Property Disposition Center must make a recommendation regarding the feasibility of continuing with the Section 8 contract and must conduct a Peer Analysis and Comprehensive Repair Survey as part of this process.

The HUD Memorandum also provides a list of criteria, one of which must be satisfied to warrant a determination of non-feasibility. The economic criteria requires a showing that "[t]he costs to rehabilitate the property make it economically infeasible to pay the monthly debt service needed to amortize the cost of rehabilitation and pay the expenses of operating the property on a monthly basis at current Section 8 HAP contract rents." (*Id.* at 88.) The rehabilitation costs are to be determined by the Comprehensive Repair Survey, and the operating costs are drawn from the Peer Analysis. As noted, the Peer Analysis, which considered both the rehabilitation and the operating costs, concluded that an annual net operating income of $343,934 would be produced and expressly stated that the project was financially viable after repairs. (*Id.* at 822.) As previously noted, HUD's memorandum is not entitled to *Chevron* deference. However, even if we accept and apply the standard espoused by HUD for making the feasibility determination, we find no basis to accept HUD's position that the property was not feasible for continued rental assistance. In fact, HUD's own analysis clearly indicates the contrary. Having found that HUD did not make a proper determination that the property was not feasible for continued assistance, we necessarily conclude that HUD failed to comply with the terms of Section 311 and therefore must reinstate the HAP contract at the property.

Even if HUD had properly made a determination that the property was not feasible for continued rental assistance, the

34

record indicates that HUD failed to consult with tenants in the course of providing other rental assistance. According to Section 311, if a determination is made that a property is not feasible for continued rental assistance, "the Secretary may, in consultation with the tenants of that property, contract for project-based rental assistance payments with an owner or owners of other existing housing properties, or provide other rental assistance." Pub. L. No. 109-115, § 311, 119 Stat. at 2462. This provision requires HUD to consult with tenants regarding what form of rental assistance it will provide following termination of a HAP contract. HUD argues that it satisfied this consultation requirement through the notice it provided to tenants of the foreclosure. The notice included a copy of the initial disposition plan for the property and gave tenants thirty days to offer written comments regarding the plan. (App. at 550.) HUD emphasizes that it even waited until after this thirty-day comment period, during which no comments were received, before finalizing the disposition plan. (Appellee's Br. at 40.)

According to HUD, its consultation process conformed with the procedure outlined in the HUD Memorandum. Specifically, the memorandum provides: "[i]f a determination is made to offer the property for sale without the current project-based Section 8 HAP contract, the Property Disposition Center will request through the appropriate Program Center Director, Section 8 Tenant Protection vouchers to assist all eligible current residents of the property." (App. at 90.) Hence, according to the process outlined in the memorandum, HUD makes a determination of what form of future assistance to provide prior to any actual consultation with the tenants.

35

Section 311 does not outline the form this consultation must take nor does it define the term. We therefore turn to a dictionary, the proper starting place for ascertaining the plain meaning of words. The term "consultation" is defined as "a council or conference (as between two or more persons) usually to consider a special matter" or "deliberation of two or more persons on some matter." *Webster's Third New International Dictionary* 490 (1993). In light of this definition, we find that mere notice of a foreclosure, accompanied by a copy of the initial disposition plan and a request for comments, does not constitute consultation. Moreover, the letter providing notice did not make any reference to the possibility of contracting for continued project-based assistance. HUD's process of developing an initial disposition plan, without any input from the tenants, and then providing that plan to the tenants with a request for written comments simply fails to satisfy the plain meaning of the term "consultation."[12] Accordingly, we conclude that HUD also failed to comply with Section 311 by not consulting with the tenants at the property when deciding what form of assistance to offer. This failure to consult constitutes a

---

[12] To the extent that HUD would argue that the memorandum's notice provision provides an interpretation of Section 311's consultation requirement that is entitled to *Chevron* deference, this position must be rejected. As already noted, the HUD Memorandum is not the type of agency statement entitled to such deference. Moreover, for the reasons noted, the process outlined in the memorandum is simply not a permissible construction of the statutory requirement of "consultation."

36

separate basis for our conclusion that HUD violated Section 311 and therefore must reinstate the HAP contract at the property.

## C.

Plaintiffs raise a second issue on appeal, contending that the District Court erred when it concluded that 24 C.F.R. § 290.17(c) governs the provision of relocation assistance in this case, rather than 24 C.F.R. § 290.17(d). Section 290.17 provides for relocation assistance when tenants are displaced from either HUD-owned multifamily properties or such properties that are subject to HUD-held mortgages. The District Court rejected Plaintiffs' argument that HUD was required, pursuant to 24 C.F.R. § 290.17(d), to provide relocation assistance at Uniform Relocation Act ("URA") levels.[13] The Court found that the case clearly fell within subsection (c), and not (d), and therefore Plaintiffs were only entitled to relocation assistance at the lower levels provided for in subsection (c). Specifically, the Court held that Plaintiffs did not satisfy the definition of "displaced person" in subsection (d), that is, "any person (family, individual, business, or nonprofit organization) that moves from the real property, or moves personal property from the real property, permanently, as a direct result of acquisition, rehabilitation or demolition for a federally assisted

---

[13] The purpose of the URA is to establish "a uniform policy for the fair and equitable treatment of persons displaced as a direct result of programs or projects undertaken by a Federal agency or with Federal financial assistance." 42 U.S.C. § 4621(b).

project."[14]  The Court found that HUD's November 10 and 17, 2004 notices to Plaintiffs were issued because of indecent conditions at the property, and not to further a federally assisted project.[15]  The Court also emphasized that HUD abated rental payments and terminated the contract *before* HUD published its disposition plan and entered into any contract with URAP.

[14] Federal regulations define a "program or project," within the context of Uniform Relocation Act assistance, as "any activity or series of activities undertaken by a Federal Agency or with Federal financial assistance received or anticipated in any phase of an undertaking in accordance with the Federal funding Agency guidelines."  49 C.F.R. § 24.2(a)(22).

[15] The District Court also found that the November 17, 2004 notice (which it incorrectly identifies as November 14), informed residents that relocation was necessary due to health, safety, and security concerns and expressed HUD's hope that tenants would relocate.  The Court concluded that these individuals were not "displaced" because they were not "required to relocate," but instead were given a choice.  It is not clear how the Court reached this conclusion. The November 17, 2004 Notice was entitled "Notice of Displacement."  (App. at 784.)  We cannot agree with the District Court's conclusion that relocation was a voluntary choice.  The tenor of the letter, read as a whole, clearly indicates that relocation was presented as necessary and required, not as an option, and that HUD merely wished that tenants would make the process as smooth as possible.

Plaintiffs, in their Reply brief, identify record evidence indicating that HUD had developed its redevelopment plan *before* "it declared the conditions default or began relocating residents." (Reply Br. at 23.)

Plaintiffs argue that, because HUD conveyed the property at foreclosure to the URAP and provided a grant of $3,400,000 for demolition and development, this case falls within the parameters of 24 C.F.R. § 290.17(d), since federal financial assistance was provided.[16] We agree that the rehabilitation of the property was a "federally assisted project." The question that remains, however, is whether the tenants were displaced due to this project or instead, as the District Court found, due to conditions at the property. We understand Plaintiffs' argument, at its core, to be that HUD was driven by its intent to redevelop the property and only used deficient conditions, which it could feasibly have repaired, as an excuse to foreclose on the property. Without foreclosing, it would have been unable to transfer ownership. HUD does concede that it "has additional regulatory obligations under 24 C.F.R. § 290.17(d) with regard to those residents that declined to exercise their right to relocate as a result of HUD's abatement of the HAP contract." (Appellee's Br. at 46.) Hence, HUD appears to acknowledge that the project was federally financed and that these final fourteen residents were displaced due to the project (rather than the conditions that

_____

[16] HUD's Handbook on Multifamily Property Disposition provides for assistance at URA levels whenever a "project sale is subsidized" and persons are displaced. HUD Handbook 4315.1, Chap. 13, § 13-5(B).

HUD claims precipitated abatement and notice to tenants in November 2004).[17]

We find that there is evidence that supports Plaintiffs' position that all of the displacements were due to a program involving federal financial assistance. This evidence includes the East Hills Visioning Plan of June 9, 2004, which recommended a reconfiguring and rebuilding of Third East Hills Park. (App. at 565.) The Plan was commissioned by URAP, but the task force included members of the local HUD office. A sworn affidavit from an architect who participated in the task force stated that the group, which included a HUD representative, was working on creating the visioning plan from August 2003 through July 2004. (*Id.* at 523-25.) According to the affidavit, the task force reached a consensus decision that foreclosure was necessary in order to redevelop the property. (*Id.*) Given the contract in place at the building, foreclosure was necessary to eliminate restrictions on the property, which allowed it to be used only as affordable rental housing for

---

[17] Defendants proceed to discuss how the requirements of Section 290.17(d) were satisfied as to the final remaining residents. In their Reply, Plaintiffs do not respond directly to this claim, instead arguing that HUD failed to provide for "ownership-level" URA relocation assistance. They rely on 49 C.F.R. § 24.2(20)(ii), which provides that an interest in a Co-op constitutes ownership, and therefore assert that a comparable replacement dwelling must include an ownership interest. On the record before us we cannot determine whether these residents received the appropriate level of assistance. This is an issue to be resolved by the District Court on remand.

40

twenty years and did not permit a reduction in the number of units during that period.

In addition, the Field Office Foreclosure Recommendation sent by the local HUD office on November 10, 2004 to the Atlanta Multifamily Property Disposition Center stated that the property's "current physical condition . . . will negatively impact the success of [the redevelopment of adjoining properties] if ownership is not changed to an entity that will work positively with management." (*Id.* at 748-49.) The Foreclosure Recommendation also stated that most residents were over-housed and recommended sale of the property with the intent of downsizing units. This recommendation preceded the Repair Survey and the termination of the HUD contract based on a technical default.

We agree with Plaintiffs that this and other evidence in the record demonstrate a disputed issue of material fact as to the cause of the displacement of tenants at Third East Hills Park. The record contains evidence from which a reasonable fact finder could conclude that HUD sought to foreclose upon the property and refused to make feasible repairs in order to facilitate a redevelopment project that it financed.

HUD has contended that, to the extent that the URA does apply, Plaintiffs' claims still must fail as they have not exhausted their administrative remedies to challenge HUD's determination of their eligibility for relocation assistance. The relevant regulation related to the Relocation Act merely allows for an administrative appeal, which a party "may file," but does not require this. 24 C.F.R. § 290.17(f). In *Darby v. Cisneros*, 509 U.S. 137, 154 (1993), the Supreme Court held that "where

41

the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." Here such review is not expressly required, but merely permitted, and hence exhaustion of the administrative appeal process was not necessary.

Accordingly, we find the grant of summary judgment on this issue improper and remand for additional fact-finding on the issues of whether the tenants were displaced due to a federally financed project and, if so, whether the tenants who were entitled to relocation assistance at URA levels received such assistance.

## IV.

For the foregoing reasons, we will reverse the District Court's decision granting summary judgment in favor of Defendants, direct HUD to reinstate the HAP contract at Third East Hills Park, and remand for further proceedings consistent with this opinion.